**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **SUSAN SNOWBALL** and **DANIEL UPPERCO,** on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**CLEANCHOICE ENERGY, INC.** and **THOMAS MATZZIE,**<br><br>Defendants. | Civil Case No.:<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

NATURE OF THE CASE ................................................................................................. 1

PARTIES ........................................................................................................................ 4

JURISDICTION AND VENUE ..................................................................................... 7

    I.   Subject Matter Jurisdiction .................................................................................. 7

    II.  Personal Jurisdiction .......................................................................................... 7

    III. Venue ................................................................................................................ 7

FACTUAL ALLEGATIONS .......................................................................................... 7

    I.   The History Of Energy Market Restructuring And TPSs' Role In Energy Markets .......... 7

    II.  CleanChoice Exploits Its Customers' Good Faith And Lack Of Knowledge About Its Costs And Expenses ................................................................................. 10

    III. Plaintiffs' Dealings With CleanChoice ............................................................. 11

    IV. The Documented History Of CleanChoice's Deceptive Business Practices .................... 30

TOLLING OF STATUTE OF LIMITATIONS ............................................................. 33

CLASS ALLEGATIONS ............................................................................................. 33

CAUSES OF ACTION .................................................................................................. 36

COUNT I (*Breach Of Contract*) .................................................................................. 36

COUNT II (*Breach Of The Implied Covenant Of Good Faith And Fair Dealing*) ...................... 39

COUNT III (*Violation Of The New Jersey Consumer Fraud Act*) ............................................. 41

COUNT IV (*Violation Of The EDECA And Retail Choice Consumer Protection Regulations*) . 47

COUNT V (*Violation Of The Truth-In-Consumer Contract, Warranty, And Notice Act*) ........... 48

COUNT VI (*Unjust Enrichment*) ................................................................................. 50

PRAYER FOR RELIEF ................................................................................................ 51

JURY DEMAND ........................................................................................................... 51

NOTICE TO ATTORNEY GENERAL ......................................................................... 51

Plaintiffs Susan Snowball and Daniel Upperco ("Plaintiffs"), by their attorneys, Finkelstein, Blankinship, Frei-Pearson & Garber, LLP and Wittels McInturff Palikovic, bring this proposed class action in their individual capacities, and on behalf of a class of consumers defined below, against Defendants CleanChoice Energy, Inc. and Thomas Matzzie (hereinafter "CleanChoice" or "Defendants" unless otherwise noted) and hereby allege the following with knowledge as to their own acts, and upon information and belief, as to all other acts:

## NATURE OF THE CASE

1. Defendant CleanChoice is a third-party electric supplier (a "TPS") that sells residential and commercial electricity in New Jersey's deregulated retail electricity market. This action seeks to redress CleanChoice's deceptive and bad faith pricing practices that have caused tens of thousands of New Jersey residential and commercial customers to pay considerably more for their electricity than they should have paid.

2. Defendants have taken advantage of the deregulation of New Jersey's retail electricity market by misrepresenting how their electricity rates are calculated. Among other conduct challenged in this action, CleanChoice makes these false and deceptive claims in the customer contracts and enrollment materials CleanChoice provides to New Jersey customers.

3. CleanChoice uses a variable rate pricing structure, and its form customer contract contains a variable rate pricing term that sets forth how variable rates are calculated. The variable rate pricing term uniformly represents that the variable electricity rate New Jersey customers pay is based on a cost-plus formula. The variable rate pricing term states that rates are "based on a number of **costs** which may include, but are not limited to: energy, transmission, capacity, ancillary services, renewable energy certificates, RTO system fees and other factors, **plus** CleanChoice Energy operating costs, expenses, and margins." Emphasis added.

1

4.      CleanChoice's representation in its customer contract regarding how its variable electricity rate is determined is false and deceptive, and designed to take advantage of consumers' good faith and their lack of knowledge about, and access to, accurate information about CleanChoice's costs, expenses, and margins. In reality, CleanChoice did not provide customers with prices based on its actual costs and expenses but instead used a pricing methodology that focused on maximizing profits. This pricing methodology produced exorbitant and unfair margins that only come to light when CleanChoice's costs and expenses are made apparent.

5.      In addition, CleanChoice abused the information asymmetry between it and its customers and omitted material information about its variable electricity rates from the materials provided to its New Jersey customers, in particular its form contract, FAQs, and its enrollment form. For example:

(i)      CleanChoice failed to adequately disclose that its variable energy rates are consistently and significantly higher than the rates a customer's existing utility charges;

(ii)     CleanChoice failed to adequately disclose that customers paying Defendants' variable rate receive no material added benefit in exchange for paying energy rates that are dramatically higher than the utility's rates, other than the minimal cost of additional renewable energy certificates;[1]

(iii)    CleanChoice failed to adequately disclose its actual variable rate methodology that it uses to calculate a customer's monthly variable rate;

---

[1] Renewable Energy Certificates or "RECs" are tradable certificates that represents the environmental benefits of electricity generated from renewable sources by a different party. RECs are tradable commodities that can be bought and sold in the market.

(iv)     CleanChoice deceptively stated that "the biggest factor determining the size of [customers'] bill is the amount of electricity they use" and "usage is almost always the biggest factor influencing electricity bills" without adequately disclosing the role CleanChoice's exorbitant variable rates play in influencing a customer's bill;

(v)      CleanChoice failed to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what a customer's local utility would have charged; and

(vi)     CleanChoice failed to adequately disclose that its costs to purchase RECs are minimal compared to its electricity procurement costs and that REC costs do not justify its exorbitant rates.

6.     As a result of this and the other deceptive, unlawful, and unauthorized acts described herein, tens of thousands of unsuspecting New Jersey customers have been, and continue to be, fleeced by CleanChoice out of millions of dollars in exorbitant electricity charges.

7.     CleanChoice also makes material misrepresentations and omissions regarding the nature of the electricity it sells. CleanChoice markets itself as a provider of "green" electricity. CleanChoice's marketing is materially misleading and deceptive in multiple ways. CleanChoice's marketing promises that customers will "get 100% clean, pollution-free energy," that a customer's "address" will receive renewable electricity, and that by enrolling with CleanChoice, customers can "obtain [their] electricity from renewable sources." These statements are false and misleading. Instead, CleanChoice merely purchases "brown" electricity at wholesale and pairs it with inexpensive offsets in the form of RECs, a fact CleanChoice hides in its fine print while making the aforementioned misrepresentations in the prominent text provided to New Jersey customers.

3

8.      Defendants' scheme, which often affects society's most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous. Exorbitant energy prices have devastating consequences for families struggling to pay their monthly utility bills, housing costs, auto costs, food, medicine, and other necessities. When there is not enough in the budget to meet these basic needs, families may face disconnection from vital utility service, inability to fully cover food and healthcare costs, and other changes that can harm the health, safety, and well-being of vulnerable New Jersey residents.

9.      Plaintiffs and other New Jersey CleanChoice customers (the "Class") have been injured by Defendants' unlawful and unauthorized practices. Plaintiffs and the Class therefore seek damages, restitution, statutory penalties, punitive damages, and declaratory and injunctive relief for CleanChoice's breach of contract, breach of the duty of good faith and fair dealing, violation of New Jersey consumer protection law, and unjust enrichment.

10.     Only through a class action can CleanChoice's customers remedy Defendants' ongoing wrongdoing. Because the monetary damages suffered by each customer are smaller than the much higher cost a single customer would incur in trying to bring suit to challenge CleanChoice's unlawful practices, it makes no financial sense for an individual customer to bring his or her own lawsuit. Further, customers do not realize they are victims of CleanChoice's deceptive and unlawful conduct. With this class action, Plaintiffs and the Class seek to level the playing field and make sure that companies like CleanChoice engage in fair and upright business practices.

**PARTIES**

11.     Plaintiff Susan Snowball resides in Califon, New Jersey. Plaintiff Snowball and her partner Plaintiff Daniel Upperco signed up with CleanChoice in or around October 2020.

4

12.     Plaintiff Daniel Upperco is Plaintiff Snowball's domestic partner. At all relevant times they shared the residence in Califon that CleanChoice served. Plaintiff Upperco manages the couple's financial affairs, including their utility account. Plaintiff Snowball has authorized Plaintiff Upperco to manage the couple's financial affairs.

13.     When the couple signed up for CleanChoice in 2020 they did so as a joint decision. As part of the enrollment process, Plaintiff Snowball received the marketing materials discussed in this Class Action Complaint. Both Plaintiffs reviewed these marketing materials. Both Plaintiffs relied on CleanChoice's marketing materials and trusted Defendants to tell the truth. Both Plaintiffs signed up with CleanChoice expecting to receive 100% clean, pollution-free electricity. Both Plaintiffs also expected CleanChoice to honor its contractual promise and charge them a reasonable rate. Plaintiffs canceled their CleanChoice service in or around February 2026.

14.     TPSs like CleanChoice have policies that allow adult household members of utility account holders to direct affairs regarding the household utility account, including contracting for the TPSs' service and making account decisions such as changing to a different energy plan, purchasing add on services, and cancelling TPS service. On information and belief, CleanChoice employed such a policy here. For example, Plaintiff Upperco canceled the couple's service with CleanChoice. At no point in Plaintiff Upperco's dealings with CleanChoice did it ever take the position that Plaintiff Upperco lacked authority to make decisions on behalf of the couple's account.

15.     Under relevant regulations and policies, both Plaintiffs are customers of CleanChoice as adult household members who share financial responsibility for CleanChoice's electricity supply. The Jersey Central Power & Light ("JCP&L") tariff provides that TPSs

operating within the JCP&L service territory must comply with the same tariff as JCP&L.[2] The tariff defines a customer as "[a]ny person . . receiving any Service[.]"[3] The definition is not limited to just the person whose name is on the account. The tariff states that "[r]eceipt and use of Service provided by the Company shall render the recipient a Customer of the Company. If such Service is provided and accepted, or used in the absence of a written agreement for Service approved by the Company, such recipient shall be deemed to have entered into an agreement with the Company[.]"[4]

16.    As a result of Defendants' deceptive and otherwise improper and unauthorized conduct, Plaintiffs incurred excessive charges for electricity.

17.    Defendant CleanChoice Energy, Inc. is a Maryland corporation headquartered at 1055 Thomas Jefferson St. NW, Washington, D.C. 20007. CleanChoice therefore resides in and is a citizen of Maryland and Washington, D.C.

18.    Defendant Thomas Matzzie is the CEO and founder of CleanChoice. He has led CleanChoice since its inception. On information and belief, he resides in Washington, D.C.

19.    Defendants mailed Plaintiffs a welcome packet that contained materials expressly sent on behalf of, and signed by, Defendant Matzzie. Of all the materials mailed to Plaintiffs, Defendant Matzzie is the only individual whose signature appears in the materials. Defendant Matzzie maintains a visible and hands-on role in the company's strategic and operational leadership, including its branding, marketing, and operations.

---

[2] Jersey Cent. Power & Light Co., Tariff for Service, BPU N.J. No. 14, Part I(A) (effective June 1, 2024), https://www.firstenergycorp.com/content/dam/customer/Customer%20Choice/Files/New%20Jersey/tariffs/BPU14-Parts-I-II-Eff-7-15-2024.pdf.

[3] *Id.* Part 1(F)(8).

[4] *Id.* Part II § 2.05.

## JURISDICTION AND VENUE

### I.     Subject Matter Jurisdiction

20.     This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendants. Plaintiffs reside in and are citizens of New Jersey and Defendants reside in and are citizens of Maryland and Washington, D.C.

### II.    Personal Jurisdiction

21.     This Court has specific personal jurisdiction over Defendants because Defendants purposefully directed their conduct into this jurisdiction by distributing and selling electricity to Plaintiffs and other New Jersey consumers, and Plaintiffs' claims against Defendants arise from Defendants' conduct in New Jersey.

### III.   Venue

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1). Substantial acts in furtherance of the alleged improper conduct occurred within this District. CleanChoice supplied electricity to Plaintiffs' residence, which is located in New Jersey.

## FACTUAL ALLEGATIONS

### I.     The History Of Energy Market Restructuring And TPSs' Role In Energy Markets

23.     In the 1990s and 2000s, numerous states deregulated their markets for retail energy. For example, in 1999, New Jersey's legislature and the New Jersey Board of Public Utilities ("NJBPU") deregulated New Jersey's market for electricity and natural gas. Among deregulation's goals were increased competition, with an eye towards achieving greater consumer choice and an overall reduction of energy rates. As a result, the State's electric and natural gas industries are open

to competition, and consumers may choose their energy supplier. Deregulation laws in other states are substantially similar.

24.     Since New Jersey opened its retail natural gas markets to competition, numerous residential and small business customers have switched to a TPS.

25.     TPSs, the new energy suppliers, compete primarily against local utilities such as JCP&L. TPSs purchase energy at wholesale directly or indirectly from companies that produce energy. TPSs then sell that energy to end-user customers. However, TPSs do not deliver energy to customers' homes and businesses, and many do not produce electricity or extract natural gas. Rather, the companies that produce energy deliver it to customers' utilities, which in turn deliver it to the customer. TPSs merely buy electricity and natural gas and then sell that energy to end-users with a markup. Thus, TPSs are essentially brokers and traders: they neither produce nor deliver electricity or natural gas, but merely buy energy from a producer and resell it to customers. The local utility also continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is whether the utility or a TPS sets the price for the customer's energy supply.

26.     TPSs are subject to minimal regulation by state utility regulators like NJBPU. TPSs like CleanChoice do not have to file or seek approval for the rates they charge or the methods by which they set their rates with the NJBPU.[5] Instead, a TPS customer's rates are governed by the TPS's agreement with its customer (and the relevant consumer protection laws).

---

[5] *See generally,* Electric Discount dond Energy Competition Act (EDECA), N.J.S.A. 48:3-49 *et seq.*

27.   The wholesale supply costs utilities like JCP&L and TPSs like CleanChoice pay for electricity are the same or virtually the same. Utilities and TPSs can purchase electricity on the same open and competitive market.[6]

28.   Notably, New Jersey utilities like JCP&L do not mark up the price they pay for securing the electricity supply used by homes and businesses, and customers pay the same dollar-for-dollar cost JCP&L pays.[7]

29.   TPSs like CleanChoice can purchase wholesale electricity using the exact same wholesale market as utilities. They can also pay the exact same prices. But they have even more options to acquire electricity than the utilities, including: owning energy production facilities; purchasing electricity from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and purchasing electricity in advance, such as by purchasing futures contracts for the delivery of electricity at a predetermined price. The fundamental purpose of deregulation is to allow TPSs to use these and other innovative purchasing strategies to reduce wholesale energy acquisition costs and pass those savings on to customers.

30.   After a customer switches to a TPS, the customer's electricity supply charge, based on a customer's kilowatt hour ("kWh") usage, is calculated using the supply rate charged by the TPS and not the customer's former utility. While the customer has a new "supplier," the utility still continues to "deliver" the customer's electricity and the utility continues to issue the customer's utility bill. The supply rate charged is itemized on the customer's bill as the number of

---

[6] In New Jersey, the NJBPU holds market-based auctions for utilities to purchase electricity at wholesale on behalf of such customers; the utilities then charge these customers a rate based upon the market-based auction outcome. A third-party consultant on behalf of the NJBPU manages the auctions, and the bidding processes and results are made publicly available. As a result, these auctions reflect market prices.

[7] *Managing Higher Electric Supply Prices*, PSE&G (last visited April 24, 2026), https://nj.pseg.com/-/media/pseg/public-site/documents/paymentassistance/bgs-electric-rate-increase-21225.ashx?utm ("Utilities do not earn a profit on the electric supply; these costs are passed through directly to customers.").

kilowatt hours multiplied by the rate. For example, if a customer uses 800 kWh at a rate of $0.07 per kWh, the customer will be billed $56.00 (800 × $0.07) for their electricity supply. This electricity supply charge is exclusive of delivery charges and other fees charged by the local utility.

31.    Customers who do not choose to switch to a TPS continue to receive their supply from their local utility, such as JCP&L. In that circumstance, JCP&L determines the energy supply rate.

## II.    CleanChoice Exploits Its Customers' Good Faith And Lack Of Knowledge About Its Costs And Expenses

32.    Because of their increased flexibility, TPSs like CleanChoice can offer rates competitive with—if not substantially lower than—the utilities' rates, and some do. Yet CleanChoice's variable rates are consistently and substantially higher than the local utility's rates and wholly detached from the energy acquisition costs to which CleanChoice's contract ties those rates.

33.    Instead, CleanChoice's rates are the result of price gouging and profiteering. CleanChoice does not have discretion under the contract to add whatever markup it chooses.

34.    CleanChoice took advantage of deregulation and the lack of regulatory oversight to charge customers exorbitant rates. In theory, energy deregulation allows customers to take advantage of market-based rates that decline when wholesale costs decline. However, CleanChoice consistently charges its customers far more than the rate promised by the variable rate pricing term in its customer contract. Customers like Plaintiffs have neither ready access to information regarding the market costs for energy supply nor the expertise to understand that information. CleanChoice can and does take advantage of this information asymmetry by charging excessive rates.

10

### III.    Plaintiffs' Dealings With CleanChoice

35.    In or around December 2020, Plaintiffs received a CleanChoice mailer. A copy of the mailer is attached hereto as **Exhibit A**. The mailer is comprised of four documents.

36.    The first document is a form letter entitled "Notice to New Jersey Residents."

37.    The second document is a "CLEAN ENERGY AUTHORIZATION FORM" that is attached to the Notice to New Jersey Residents. To sign up for CleanChoice, a customer signs the Clean Energy Authorization Form, detaches it from the Notice to New Jersey Residents, and returns it to CleanChoice.

38.    The third document is CleanChoice's form customer contract. This document is called the "Terms and Conditions of Service," and it is printed on the back side of the Notice to New Jersey Residents and Clean Energy Authorization Form.

39.    The fourth document is a "Frequently Asked Questions About Switching to Clean Energy," (the "FAQs").

40.    Plaintiffs reviewed the mailer's contents and, based on CleanChoice's promises to provide their home with 100% clean, pollution-free energy and to base the rate on CleanChoice's costs, expenses, and margins, thereafter decided to sign up for CleanChoice.

41.    The Notice to New Jersey Residents falsely represents to prospective customers that if they enroll, they would "[g]et 100% clean, pollution-free energy." This is false because CleanChoice's electricity is not 100% clean, pollution-free. When a CleanChoice customer uses electricity, they pollute. The more electricity they use, the more they pollute. This is because the electricity delivered to the customer's home (which is delivered by the local utility) is no different than the electricity the utility delivers to all other utility customers. CleanChoice customers do not receive a different type of electricity. Instead, CleanChoice simply purchases inexpensive RECs that represent the production of wind or solar electricity by another entity.

11

42.     CleanChoice's Clean Energy Authorization Form contains a pre-checked checkbox with the following text next to it:

> I am the account holder and voluntarily authorize CleanChoice Energy to enroll my address shown at left for 100% renewable energy electric supply. I have received a copy of the terms and conditions of service and understand that I may switch back to polluting fuels with JCP&L at any time. I authorize this enrollment by signing this form.

Plaintiff Snowball filled in her JCP&L account number and her email address, dated and signed the Clean Energy Authorization Form, and mailed it to CleanChoice.

43.     The back of the Clean Energy Authorization Form likewise states that "I have received and understand the terms and nature of my service for my new renewable energy plan. I authorize this enrollment for 100% renewable energy supply by signing this form."

44.     The "Terms and Conditions of Service" document does not have a title. However, the Clean Energy Authorization Form refers to that document as the "terms and conditions of service." Plaintiffs adopt that terminology in this Class Action Complaint.

45.     The Terms and Conditions of Service refers to itself as "[t]his contract" and states that "BY RESPONDING TO THIS LETTER AND SELECTING CLEAN ENERGY YOU WILL BE ENROLLING FOR ELECTRICITY SERVICE FROM CLEANCHOICE ENERGY, INC."

46.     The Terms and Conditions of Service is the contract between Plaintiffs and CleanChoice.

47.     Consistent with its role as a mere energy market middleman, the Terms and Conditions of Service included in CleanChoice's mailer contains the following pricing term:

> [Y]ou will be charged a variable supply rate and your price may vary each month and is based on a number of costs which may include, but are not limited to: energy, transmission, capacity, ancillary services, renewable energy certificates, RTO system fees and other factors, plus CleanChoice Energy operating costs, expenses, and margins.

12

48. In other words, CleanChoice's variable supply rate would be "based on" its "costs" "plus" and a fixed adder to cover CleanChoice's "operating costs, expenses, and margins." Plaintiffs relied on this pricing term in deciding to enroll with CleanChoice.

49. The term "based on" provides exclusivity and precludes CleanChoice's rate-setting discretion such that monthly fluctuations in its variable electricity rates can be determined solely by CleanChoice's costs, expenses, and margins.

50. Reasonable consumers understand that when you make a calculation "based on" specific factors, you take only those factors into account; the calculation is made "relying on" or "building on" those factors. For example, you calculate a baseball player's batting average "based on" that player's number of hits and number of at bats—nothing more and nothing less. The area of a rectangle is calculated "based on" its width and length, while velocity is calculated "based on" distance and time. Here, CleanChoice's use of the term "based on" limits the variation in the variable rates to be determined solely by the cost components listed in CleanChoice's Terms and Conditions. An assessment of those costs, however, shows that CleanChoice did not base customers' variable rates on those inputs and instead added exorbitant and fluctuating margins.

51. The Terms and Conditions of Service also state that "[i]f you choose to enroll, you will receive terms and conditions further explaining the details of your plan," and that "[a]dditional eligibility requirements, terms and conditions may apply." These phrases do not allow CleanChoice to make material changes to the parties' contract. New Jersey regulations prohibit material changes to TPS contracts unless those TPSs obtain a customer's affirmative consent on any material changes. N.J.A.C. § 14:4-7.6(a), (l).

52. CleanChoice's FAQs contain several false and deceptive claims regarding the nature of CleanChoice's electricity supply.

53.    First, the FAQs falsely claim that "the electricity your home uses will be replenished by clean, renewable wind and solar sources supplied by CleanChoice Energy." This misleadingly suggests that CleanChoice would send renewable electricity to "replenish" the customer's electricity usage. That is not how the electricity grid works nor what CleanChoice actually did. Instead, CleanChoice continued to supply the same brown energy to a customer's home and bought RECs on the back end.

54.    Indeed, in a May 30, 2025 regulatory submission to the Illinois Commerce Commission, CleanChoice explained:

> It is impossible to isolate the electricity generated by renewables [*sic*] sources from the electricity generated by non-renewable sources because they are all mixed together (sometimes called 'null power'). To illustrate, here's an analogy: Imagine a huge lake that's fed by many different rivers. The lake represents the electric grid, and each of those rivers represents a single generation source – there's the Solar River, the Coal River, the Nuclear River, the Wind River, and so on. Once the water from each of those rivers enters the lake, they combine, making it impossible to separate water that came from the Wind River from water that came from the Coal River.

55.    Second, the FAQs represent that "[f]or most consumers, the biggest factor determining the size of their bill is the amount of electricity they use" and that "usage is almost always the biggest factor influencing electricity bills." This is misleading because it does not account for the role CleanChoice's exorbitant variable rates play in influencing a customer's bill. Here, Plaintiffs' bills skyrocketed not because their usage skyrocketed but because of CleanChoice's price gouging.

56.    Third, the FAQs represent that CleanChoice "offer[s] ***only*** 100% renewable energy." Emphasis added. This is false, because as CleanChoice admitted to the Illinois Commerce Commission, it "is impossible to separate" electricity sources such that when a CleanChoice customer flips their light switch they are consuming ***only*** 100% renewable energy.

14

57. Fourth, the FAQs represent that "renewable sources do not produce carbon dioxide or contribute to air pollution." This falsely implies that the "renewable" electricity reasonable consumers buy from CleanChoice does not produce carbon dioxide or contribute to air pollution, but the electricity CleanChoice customers use is the same brown energy they would have used had they remained with the utility.

58. On December 17, 2020, Plaintiffs both reviewed CleanChoice's mailer, and Plaintiff Snowball signed and returned the Clean Energy Authorization Form with Plaintiff Upperco's consent.

59. After Plaintiffs returned the Clean Energy Authorization Form in December 2020, CleanChoice mailed them a Welcome Packet. The Welcome Packet is attached hereto as **Exhibit B**. The Welcome Packet was sent in an envelope labeled "Important information regarding your new clean electricity subscription." The outside of the envelope did not indicate that the materials contained within changed the contract Plaintiffs already had with CleanChoice or somehow superseded the Plaintiffs' signed acknowledgement in the Enrollment Authorization Form that "I have received a copy of the terms and conditions of service."

60. The Welcome Packet contained three documents: a "Welcome Letter," a "Contract Summary," and a "New Jersey Residential Disclosure Statement, Terms and Conditions" (the "Disclosure Statement").

61. The Welcome Packet was addressed to Plaintiff Snowball and was signed by Defendant Matzzie. It bore his signature and no other signature. The representations contained therein are attributable to Defendant Matzzie as the signatory to the Welcome Packet.

62. While the Welcome Packet served a marketing purpose, it does not change any material term of the contract the parties agreed to when Plaintiffs signed and returned the

15

Enrollment Authorization Form. Under New Jersey regulation, a TPS cannot "change material terms of the contract without the customer's affirmative authorization unless the change is required by operation of law." N.J.A.C. § 14:4-7.6(l). Therefore, no document in the Welcome Packet can change a material contract term provided in the Terms and Conditions of Service.

63.    The Welcome Letter from Defendant Matzzie stated that CleanChoice intended "to make clean energy as easy and seamless as possible," and for that reason, "even though we'll be sourcing wind and solar energy on your behalf, nothing else will change in terms of your service." This statement is false. The way in which CleanChoice calculated customers' electricity rates as compared to the utility dramatically changed.

64.    Defendant Matzzie's Welcome Letter also twice repeated the same false representation from the Notice to New Jersey Residents that customers would receive "clean, pollution-free energy." It likewise made the false representation that "we'll make sure the energy sourced for you comes from 100% clean wind and solar power," which falsely suggests that the energy sent to CleanChoice customers' homes would come from wind and solar power, not that CleanChoice would merely purchase credits to offset customers' electricity usage. Defendant Matzzie's Welcome Letter also provides a "promise" that CleanChoice would supply "pollution-free, 100% clean energy" and use "only 100% renewable sources" because "[u]nlike most other energy companies, we don't use a mix of blended products with dirty fossil fuels that pollute the environment and contribute to climate change." Yet that is exactly what CleanChoice does.

65.    The Contract Summary included in the welcome packet provides the following pricing term:

> The price may vary each billing cycle beginning after the third month, with no advance notice, based on an evaluation of a number of factors that affect your total price of electricity. These factors may include, but are not limited to: the cost to supply electricity in the

> PJM Interconnection, LLC market (including energy, capacity, settlement, ancillary services, renewable energy, Distribution Charges and other PJM Interconnection, LLC market-related factors).

66.     The "factors" that are specifically identified in this pricing term are all components of TPSs' wholesale procurement costs. This pricing term uses different language than the pricing term in the Terms and Conditions of Service, though the import of both pricing terms suggests to a reasonable consumer that CleanChoice's electricity is provided on a cost-plus basis. To the extent this pricing term is materially different from the pricing term in the Terms and Conditions of Service, it is void as CleanChoice failed to comply with regulations requiring it to obtain customers' affirmative consent for material changes.

67.     The Disclosure Statement contains a third pricing term:

> The price may vary each billing cycle beginning after the third month, with no advance notice, based on an evaluation of a number of factors that affect Your total price of electricity. These factors may include, but are not limited to: the cost to supply electricity in the PJM Interconnection, LLC market (including energy, capacity, settlement, ancillary services, renewable energy, Distribution Charges and other PJM Interconnection, LLC market-related factors); applicable fees, charges, costs and expenses; expected margins; competitive prices and other market and business conditions as determined solely by Us.

68.     Notwithstanding CleanChoice's cost-plus promise in the Terms and Conditions of Service, it did not charge variable rates that were calculated based on CleanChoice's costs, expenses, and a reasonable margin. Instead, CleanChoice charged variable rates that were untethered from its costs and expenses and were set to maximize CleanChoice's profits. This allowed CleanChoice to extract exorbitant and unfair margins that only come to light when CleanChoice's costs and expenses are made apparent. Electricity and RECs are fungible commodities. There is no reason for consumers to pay a TPS a huge profit margin for acting as an energy market middleman.

17

69.     To the extent this pricing term is materially different from the pricing term in the Terms and Conditions of Service, it is void as CleanChoice failed to comply with regulations requiring it to obtain customers' affirmative consent for material changes.

70.     Further, CleanChoice's costs associated with purchasing RECs are minimal compared to the cost of procuring electricity in wholesale markets, and REC costs cannot explain CleanChoice's exorbitant rates. Indeed, in 2025 in the PJM Interconnection, which operates the grid for Plaintiffs' utility zone in New Jersey, RECs were priced at approximately 2 cents per kWh.[8] CleanChoice charged consumers far more for its supposedly "100% clean, pollution-free" electricity than provided for in the pricing term of CleanChoice's contract.

71.     Other than possibly a desire to promote or use renewable energy, price is the most important consideration for potential CleanChoice energy customers. Given that there is no difference at all in the electricity that TPSs supply as opposed to the consumer's local utility, the only reason a consumer would switch to CleanChoice is for the potential savings offered in a competitive market as opposed to prices offered by a regulated utility, plus a willingness to pay the costs of RECs.

72.     Pursuant to CleanChoice's Terms and Conditions of Service, Plaintiffs received a guaranteed introductory rate of 11.2 cents per kilowatt hour for their first three months of service. After that guaranteed introductory rate expired, CleanChoice increased Plaintiffs' electricity rate substantially.

---

[8] U.S. State Electricity Resource Standards: 2025 Data Update, Lawrence Berkeley National Laboratory (August 2025), at 4, https://emp.lbl.gov/sites/default/files/2025-08/State Electricity Resource Standards-2025 Data Update.pdf

73.     A comparison of CleanChoice's rates to prevailing market costs, including the cost to procure RECs (for March 2025–January 2026), demonstrates that CleanChoice does not charge a rate based on the factors promised in its customer contract.

74.     The table below, *see* ¶ 77, identifies (i) the billing periods during which Plaintiffs were enrolled in CleanChoice's variable rate for electricity services, (ii) the variable rate CleanChoice charged Plaintiffs, (iii) the corresponding "Market Supply Costs," which accounts for the cost of RECs, and (iv) the differences between CleanChoice's rates and the contemporaneous Market Supply Costs.

75.     The Market Supply Costs below are based on the costs that TPSs like CleanChoice incur supplying a retail customer in Plaintiffs' utility areas for each period, including the cost to procure RECs paired with 100% of the electricity sold to that customer. The Market Supply Costs include the weighted average of the hourly day-ahead PJM prices in Plaintiffs' utility zone, weighted by the metered load in the JCP&L service territory, along with ancillary services costs, capacity costs, RECs, and various relatively small charges related to the PJM (all the same costs that CleanChoice identifies in its contract with Plaintiff). These charges are tracked by PJM's Data Miner, the program that allows users to download data sets in the PJM for hourly metered loads, hourly day-ahead prices, and hourly ancillary service prices. Transmission rates were identified directly from JCP&L.

76.     The Market Supply Costs therefore represent the costs and market conditions that determine the costs that CleanChoice and other TPSs incur in providing energy to retail customers. The Market Supply Costs reflect the costs that CleanChoice's competitors incur. That CleanChoice's rates are so vastly different from the Market Supply Costs demonstrates that CleanChoice's rates are not "based on" its actual costs as required by CleanChoice's contract.

77.     The following table represents Plaintiffs' CleanChoice rates versus the Market Supply Costs. The Market Supply Costs include the cost of purchasing RECs.

| Billing Period | CleanChoice Rate (Cents Per kWh) | Market Supply Costs (Cents per kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| March 2025 | 28.4 | 9.6 | 2.94x | 194% |
| April 2025 | 32.0 | 9.9 | 3.24x | 224% |
| May 2025 | 31.2 | 8.4 | 3.70x | 270% |
| June 2025 | 32.1 | 14.1 | 2.28x | 128% |
| July 2025 | 35.4 | 16.1 | 2.20x | 120% |
| August 2025 | 34.9 | 11.5 | 3.04x | 204% |
| September 2025 | 38.5 | 10.8 | 3.56x | 256% |
| October 2025 | 37.6 | 12.1 | 3.11x | 211% |
| November 2025 | 39.8 | 12.5 | 3.18x | 218% |
| December 2025 | 44.9 | 13.8 | 3.25x | 225% |
| January 2026 | 46.1 | 24.1 | 1.92x | 92% |

78.     As the above table shows, CleanChoice's variable rates are consistently and substantially higher than a rate based on the Market Supply Costs. This demonstrates that CleanChoice's rates are not "based on" its costs.

79.     Plaintiffs' CleanChoice rates are higher than the Market Supply Costs for ***every month*** Plaintiffs have data and are on average an overcharge of 2.95 times (195% overcharge) the Market Supply Costs. Indeed, CleanChoice's rates are double or more than the Market Supply Costs for 10 of the 11 months and triple or more than the Market Supply Costs for 7 of the 11 months.

80.     The rates CleanChoice charged Plaintiffs likewise fail to fluctuate in accordance with Market Supply Costs. For instance, when the Market Supply Costs declined from 16.1 cents

per kWh to 10.8 cents per kWh between July and September 2025 (declining 33%), CleanChoice's variable rate increased from 35.4 cents per kWh to 38.5 cents per kWh (increasing 9%).

81.     The cost of wholesale electricity is the primary component of the non-overhead costs CleanChoice incurs. As explained above, the other cost factors that may affect its variable rate (such as capacity, ancillaries, transmission costs, transportation costs, and line losses) are included in the Market Supply Costs as well. These additional wholesale costs are relatively insignificant in terms of the overall costs CleanChoice incurs to provide retail electricity, and do not substantially fluctuate over time. Moreover, other TPSs incur these costs as well, yet they offer substantially lower rates. Nor does the cost of purchasing RECs corresponding to 100% of Plaintiffs' electricity supply explain CleanChoice's exorbitant rates.

82.     Therefore, CleanChoice's non-overhead cost factors cannot explain CleanChoice's egregiously high variable rate or the reason its rates are disconnected from changes in wholesale costs. CleanChoice's overhead costs (which are relatively minor compared to electricity costs) also cannot explain the high variable rates charged, as CleanChoice's own fixed rates, which are significantly lower than its variable rates, demonstrate.

83.     Indeed, CleanChoice routinely charges its customers variable rates for electricity substantially higher than average among TPSs in New Jersey.[9] The U.S. Energy Information Administration ("EIA") compiles average pricing data for TPSs. That dataset tells a story of CleanChoice continually overcharging New Jersey customers, even in comparison to other TPSs. The EIA has data for the years 2021 through 2024, during which time Plaintiffs were customers. In each of those years, CleanChoice price gouged customers.

---

[9] *See* Electric Sales, Revenue, and Average Price, U.S. Energy Information Administration, Table 12, https://www.eia.gov/electricity/sales_revenue_price/ (last visited April 24, 2026).

84.    For example, when considering the TPSs with the largest New Jersey market share (the TPSs that sold over 50,000 MWh per year in the state), CleanChoice was the ***most expensive TPS*** for each year that the EIA has data during which Plaintiffs received electricity supply from CleanChoice.

85.    In 2024, the average TPS's electricity rate was 18.46 cents per kWh, while CleanChoice's was 21.40 cents per kWh, which is 16% above average. Among the major players, CleanChoice stood out as the most expensive. When considering just the TPSs that sold over 50,000 MWh in New Jersey in 2023, CleanChoice was the most expensive and 30% above average for the major players in the state in 2023.

86.    In 2023, the average TPS's electricity rate was 18.81 cents per kWh, but CleanChoice's was 22.07 cents per kWh, which is 17% above average. Among the major players that sold over 50,000 MWh, CleanChoice was the most expensive and 27% more expensive than average among the major players.

87.    In 2022, the average TPS's electricity rate was 17.76 cents per kWh, but CleanChoice's was 22.66 cents per kWh, which is 28% above average. Among the major players that sold over 50,000 MWh, CleanChoice was the most expensive and 41% more expensive than average among the major players.

88.    In 2021, the average TPS's electricity rate was 14.54 cents per kWh, but CleanChoice's was 17.07 cents per kWh, which is 17% above average. Among the major players that sold over 50,000 MWh, CleanChoice was the most expensive and 26% more expensive than average among the major players.

89. In sum, for every year with available data during which Plaintiffs received CleanChoice's electricity supply, CleanChoice's rates were higher than average and the most expensive rates among the major players in the state.

90. Comparing CleanChoice to utility rates tells the same story.

91. The publicly available data on the local utilities' rates (like JCP&L, the utility serving Plaintiffs' residence), serve as an ideal indicator of the wholesale cost of energy and the other applicable market-based costs and expenses suppliers incur because the utilities pay these same costs and then pass them on through their supply rates.

92. Not only are local utilities CleanChoice's primary competitors (as utilities always are), but JCP&L supply costs reflect the actual cost to supply customers with energy. Consequently, local utilities' supply rates are an apt comparator for determining (at least at the pleading stage) whether CleanChoice's variable rates are actually based on CleanChoice's energy costs.

93. To the extent CleanChoice procures its wholesale energy supply materially in advance of Plaintiffs' utility, such advance purchases still do not explain CleanChoice's persistently high rates. While electricity bought further in advance might not exactly match the prices utilities pay, over time those costs should be commensurate as they are both based on market forces.

94. Consequently, the public data on local utilities' electricity supply rates are a reliable proxy for CleanChoice's market costs because local utilities are CleanChoice's primary competitor and the utilities' costs represent wholesale market prices for electricity and associated costs (even when accounting for REC costs).

95.     In fact, CleanChoice has a tactical advantage over the utilities as it can (and does) combine wholesale purchasing with additional financial products. For example, in a January 9, 2018 interview, CleanChoice's CEO Defendant Matzzie stated "[w]e're a member of the wholesale energy markets" including "the wholesale power markets, the PJM and New York ISO and ISO New England and MISO."[10]  The CEO continued, "we transact there with the suppliers" and  "we have trading relationships with wholesale energy suppliers, generators, and investment banks  who  provide  financial  derivatives."[11]  Defendant  Matzzie  also  made  clear  that CleanChoice's wholesale "procurement" is "actually the least exciting and interesting part of our business. It doesn't move very fast and that's good. We're not speculators."[12]

96.     Accordingly, CleanChoice's costs for purchasing energy should at the very least reflect (if not undercut) market prices, albeit over a longer term. Therefore, while the utility's procurement costs might not precisely match CleanChoice's actual costs (which are not available absent discovery), the latter's costs should correlate with the utility's costs and over time should be roughly similar (even when accounting for REC costs). Instead, CleanChoice's exorbitant rates when compared to the utility rate show that CleanChoice's rates were not "based on" its costs as required by the variable rate pricing term in CleanChoice's customer contract.

97.     The following table compares Plaintiffs' variable electricity supply rates from CleanChoice for the 11 billing periods accessible to Plaintiffs from March 2025 to January 2026 to their local utility JCP&L's contemporaneous electricity supply rates.

---

[10]  Experts  Only  Podcast,  *Interview  with  CleanChoice  CEO  Tom  Matzzie*,  *available  at* https://cleancapital.com/resources/episode-14-tom-matzzie/ (last visited April 24, 2026).

[11] *Id.*

[12] *Id.*

| Billing Period | CleanChoice Rate (Cents Per kWh) | JCP&L's Supply Rate (Cents per kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| March 2025 | 28.4 | 11.9 | 2.39x | 139% |
| April 2025 | 32.0 | 11.9 | 2.68x | 168% |
| May 2025 | 31.2 | 12.7 | 2.46x | 146% |
| June 2025 | 32.1 | 15.1 | 2.13x | 113% |
| July 2025 | 35.4 | 15.1 | 2.35x | 135% |
| August 2025 | 34.9 | 15.1 | 2.31x | 131% |
| September 2025 | 38.5 | 15.9 | 2.43x | 143% |
| October 2025 | 37.6 | 15.9 | 2.37x | 137% |
| November 2025 | 39.8 | 15.5 | 2.57x | 157% |
| December 2025 | 44.9 | 14.6 | 3.07x | 207% |
| January 2026 | 46.1 | 14.6 | 3.16x | 216% |

98.     The "Overcharge Percentage" column demonstrates the drastic difference between CleanChoice's rates for Plaintiffs' account and JCP&L's contemporaneous supply rates. The "Overcharge Factor" column demonstrates the factor at which CleanChoice overcharged Plaintiffs compared to the reasonable benchmark of JCP&L's rates. CleanChoice's rates were more than double JCP&L's rates *every billing period* and were more than *triple* JCP&L's rates for 2 of the 11 billing periods. On average, CleanChoice's rates were 2.5 times (154% overcharge) JCP&L's rates.

99.     Given CleanChoice's variable rate pricing term, JCP&L's electric supply rates are a reasonable, pre-discovery benchmark of CleanChoice's supply costs. As explained above, JCP&L is CleanChoice's primary competitor in Plaintiffs' service territory, and its rates reflect the average wholesale price of electricity and associated costs over time (the same costs that TPSs like

25

CleanChoice incur) without any markup, making the utility's rates an ideal comparator for a rate supposedly "based on" CleanChoice's costs.

100. The disconnect between JCP&L's rates and CleanChoice's rates further demonstrates that CleanChoice's rates did not even remotely reflect CleanChoice's costs. For Plaintiff, between November and December 2025, JCP&L's rates decreased by 6%, yet CleanChoice's rates increased by 13%.

101. CleanChoice did not adequately disclose to Plaintiffs that its variable electricity rates are consistently and significantly higher than the rates JCP&L charges. CleanChoice likewise failed to adequately disclose to Plaintiffs that, in paying CleanChoice's variable energy rates, Plaintiffs received no added material benefit at a dramatically higher price than if it had bought its energy from JCP&L (even accounting for REC costs).

102. No reasonable customer, including Plaintiff, would expect a TPS's variable rate to be artificially inflated beyond any resemblance to the local utility's rates. Indeed, the fact that CleanChoice's rates were *always*[13] double or triple the local utility's rates show the extent of CleanChoice's unscrupulous price gouging.

103. CleanChoice knew that its variable rates were consistently and significantly higher than the local utility's rates.

104. Defendants' failure to disclose this fact was a material omission and was materially misleading because the most important consideration for any consumer choosing an energy supplier is price; energy is a fungible commodity.

---

[13] For the months with available billing data.

26

105.    Moreover, Defendants at no time informed Plaintiffs that the cost for electricity would be ***continuously significantly*** higher than the same electricity sold by JCP&L, even when accounting for the RECs CleanChoice paired with a customer's usage.

106.    Defendants lulled consumers into purchasing their energy supply via material omissions about their variable energy rates. Defendants did so to reap excessive profits at the expense of unsuspecting consumers. Defendants acted with actual malice, or wanton and willful disregard, for consumers' well-being.

107.    Even accounting for RECs, CleanChoice's rates were still exorbitant when compared to the utility. The below table adds 2 cents per kWh to the utility's rates to show that CleanChoice's REC costs do not explain its excessive variable rates. Notably, however, adding 2 cents per kWh overestimates the effect of RECs on a TPS's procurement costs because the utility's mix of energy (and thus its rates) already incorporates some level of RECs. To reach the 100% offset that CleanChoice markets, the utility would not have to purchase RECs corresponding to 100% of the customer's usage. Instead, it would only need to purchase RECs to cover the utility's percentage of non-renewable energy.

| Billing Period | CleanChoice Rate (Cents Per kWh) | JCP&L's Rates Plus RECs (Cents per kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| March 2025 | 28.4 | 13.9 | 2.02x | 102% |
| April 2025 | 32.0 | 13.9 | 2.26x | 126% |
| May 2025 | 31.2 | 14.7 | 2.10x | 110% |
| June 2025 | 32.1 | 17.1 | 1.86x | 86% |
| July 2025 | 35.4 | 17.1 | 2.05x | 105% |
| August 2025 | 34.9 | 17.1 | 2.02x | 102% |
| September 2025 | 38.5 | 17.9 | 2.13x | 113% |
| October 2025 | 37.6 | 17.9 | 2.08x | 108% |
| November 2025 | 39.8 | 17.5 | 2.25x | 125% |
| December 2025 | 44.9 | 16.6 | 2.67x | 167% |
| January 2026 | 46.1 | 16.6 | 2.74x | 174% |

108. As shown above, even this conservative metric establishes that CleanChoice overcharged Plaintiffs for *every month* for which they had billing data.

109. Accordingly, these four benchmarks (Market Supply Costs, the rates of other TPSs, utility rates, and CleanChoice's own fixed rates) demonstrate that CleanChoice's rates were not based on its costs as required under the contract.

110. CleanChoice's need to make a profit does not justify its outrageously high rates. A reasonable consumer might understand that a TPS will attempt to make a reasonable profit by selling consumers retail electricity. However, such a consumer would also expect that such profits would be commensurate with its middleman role and would be consistent with competing suppliers of electricity in their respective markets. Reasonable consumers would not expect a middleman to extract such outrageously high profit margins. Nor would they expect a mere energy market

28

intermediary to profiteer to such an extreme level that its middleman's retail rate would bear essentially no relation to a rate based on the middleman's procurement costs.

111.    As demonstrated by the analysis of EIA data, CleanChoice's rates are substantially higher than other TPSs, even though those other TPSs incur the same costs and have similar profit motives. *See supra* ¶¶ 83–89.

112.    In this case, CleanChoice knew that once it had acquired the consumer's energy account, it could charge high energy rates and many consumers (if not most) would not know, and simply pay the exorbitant charges, month after month.

113.    It is well-established that defaults are powerful drivers of consumer behavior. There are various factors underlying this human tendency that have been discussed in the judgment and decision-making literature, such as the work about defaults, the "status quo bias,"[14] and "Nudges."[15]

114.    The fact that CleanChoice charges fixed rates (which also include RECs) that are substantially lower than its variable rates also proves that the costs, expenses, and margins CleanChoice incurs cannot justify its exorbitant variable rates. CleanChoice's fixed rates are always substantially lower than its variable rates. Yet fixed rates expose CleanChoice to greater financial risk—by promising the customer a fixed rate in advance, CleanChoice bears the risk that the price it pays to cover the customer's electricity usage in the future may be higher than the promised fixed rate. Nevertheless, the margins CleanChoice reaps from its variable rates are tremendously higher than its fixed rate margins. CleanChoice incurs the same procurement costs and expenses to supply its fixed rate customers as it incurs for its variable rate customers. It is not

---

[14] Daniel Kahneman, Jack L. Knetsch and Richard H. Thaler (1991), "Endowment Effect, Loss Aversion, and Status Quo Bias," *The Journal of Economic Perspectives*, Vol. 5, pp. 193–206.

[15] R. Thaler and S. Sunstein (2008), *Nudge*, Yale University Press.

commercially reasonable to extract massive profit margins on the same electricity that is sold to customers in a way that exposes the seller to *less* risk.

115.    Defendants' exploitation of consumer inertia is further exacerbated by the fact that ordinary consumers do not have the wherewithal to appreciate that although this energy market intermediary promised a rate based on its costs, what is actually going on is that CleanChoice is layering a massive profit margin on top of modest costs and operating expenses.

## IV.    The Documented History Of CleanChoice's Deceptive Business Practices

116.    CleanChoice has a long record of using deceptive marketing and sales practices, which a 2022 investigative report describes as "a disturbing pattern of behavior" built upon "a fundamentally misleading for-profit business model that capitalizes on a lack of popular understanding about how electrical grids operate."[16]

117.    Just last year, the Massachusetts Department of Public Utilities ("DPU") issued a Notice of Probable Violation ("NOPV")[17] detailing multiple CleanChoice deceptive practices and outlining numerous violations of the DPU's own regulations as well as regulations issued by the Massachusetts Attorney General. In evaluating CleanChoice's contractual promise to provide Massachusetts variable rates that are "based on market conditions and CleanChoice Energy's costs to provide energy supply service," the DPU found that "CleanChoice's contract summary form, and contract, conflicted with CleanChoice's actual business practice of raising prices regardless of

---

[16] William Bredderman, *Critics Say CleanChoice Energy, Founded By Political Operatives, Targets Eco-Conscious Consumers With Misleading Promotions*, The Daily Beast, Mar. 29, 2022, *available at* https://www.thedailybeast.com/cleanchoice-energy-is-the-sneaky-green-energy-company-that-pisses-off-climate-do-gooders (last visited April 24, 2026).

[17] Mass. Dep't of Pub. Utils., *CleanChoice Energy, Inc., Notice of Probable Violation*, D.P.U. 25-138 (Sept. 15, 2025), *available at* https://fileservice.eea.comacloud.net/V3.1.0/FileService.Api/file//aefgicigj?DBQIQUxUjvHmptOWDiQXpGsLVPSl7NdqNUTTiLCXtaiPcSxI+blU344Khxm+qpOeg0hKFj9M9l/xQR8+/8GqPvdGgrFe6XR6ngIfa80wd3rxFD8G4j981M2Rna9aVTXA.

market conditions and its energy costs" and that accordingly "CleanChoice's contract summary forms and contract were inaccurate and deceptive."[18] The DPU found that CleanChoice engaged in "Deceptive Pricing Practices," as its pricing conflicted with its contractual obligation to charge a variable rate based on market conditions and CleanChoice's costs to provide energy supply service.[19] The DPU noted that CleanChoice "offers electricity supply products that have a three-month fixed introductory price, which then renews to a variable monthly price if the customer does not cancel service or choose a new product." The DPU in its NOPV identified "problematic business practices that CleanChoice employed in marketing electric supply service" which together constituted "egregious misconduct and a pattern of misconduct."[20]

118.    In 2023, CleanChoice paid $600,000 in a settlement[21] with the staff of the Illinois Commerce Commission and two consumer advocacy organizations that alleged that "CleanChoice asks customers to pay a premium for grid power matched with Renewable Energy Credits (RECs), but fails to provide critical information, such as what type of RECs are being offered, where the RECs were generated, and the 'price to compare' (the default utility's current supply price). Without this information, customers cannot evaluate the costs and benefits of these offers."[22]

---

[18] *Id.* at 14.

[19] *Id.* at 13-15.

[20] *Id.*

[21] Settlement Agreement, *Environ. Law & Policy Cen. v. CleanChoice Energy, Inc.*, No. 20-0499 (Illinois Commerce Commission Feb. 21, 2023), *available at* https://www.icc.illinois.gov/docket/P2020-0499/docket-sheet (last visited April 24, 2026).

[22] Verified Formal Complaint at 2, *Environ. Law & Policy Cen. v. CleanChoice Energy, Inc.*, No. 20-0499 (Ill. Comm. Comm'n May 29, 2020), *available at* https://www.icc.illinois.gov/docket/P2020-0499/docket-sheet (last visited April 24, 2026).

119.    In 2017, the Town of Acton, Massachusetts alerted the Massachusetts Department of Public Utilities that CleanChoice was running "a misleading marketing campaign," by sending advertisements to residents and "creating the impression that it is a government communication."[23]

120.    In 2016, CleanChoice (then operating under the name "Ethical Electric")[24] entered into an Assurance of Voluntary Compliance ("AVC") with the Illinois Attorney General in a matter that alleged that CleanChoice improperly marketed its electricity as "green" when it was really just supplying "brown" energy paired with the use of RECs as offsets, and that it claimed its price was comparable to the local utility when it was routinely more than 5 percent higher.[25]  Specifically, the Illinois Attorney General's action stemmed from CleanChoice's direct mail solicitations promoting its "Clean Energy Option" product as powering customers' homes with electricity generated exclusively from renewable energy sources like wind and solar. In truth, however, the electricity provided was simply electricity from the electric grid that was then paired with RECs. As part of the AVC, CleanChoice agreed to make $3 million available to customers.[26]

121.    And in 2015, CleanChoice (again operating under the "Ethical Electric" name) entered into an Assurance of Voluntary Compliance with the Pennsylvania Attorney General for

---

[23]    Letter to Mass. Dep't of Pub. Utils., Aug. 4, 2017, *available at* https://www.actonma.gov/DocumentCenter/View/3921/Letter-of-Complaint---Mass-Dept-Public-Utilities?bidId= (last visited April 24, 2026).

[24]    Press Release, *Ethical Electric Is Now CleanChoice Energy*, Oct. 31, 2016, *available at* https://cleanchoiceenergy.com/news/cleanchoice_energy_announcement (last visited April 24, 2026).

[25]    Walton, Robert, *Illinois Attorney General Reaches Settlement With "Green" Energy Supplier*, UTILITYDIVE (Aug. 18, 2016), *available at* https://www.utilitydive.com/news/illinois-attorney-general-reaches-settlement-with-green-energy-supplier/424700/ (last visited April 24, 2026).

[26]    *Id.*

misleading customers into thinking its advertisements were from the local utility, rather than from an ARES.[27]  The AVC required CleanChoice to cease its misleading advertising practices.[28]

## TOLLING OF STATUTE OF LIMITATIONS

122.    Given that Defendants have engaged in a series of deceptive acts and omissions for which it billed consumers and consumers continued to pay, the continuing violation doctrine applies, effectively tolling the limitations period until the date of CleanChoice's last wrongful act against Plaintiff, which was in or around February 2026, when CleanChoice last overcharged Plaintiffs substantially more for electricity than the local utility.

123.    Plaintiffs' claims are timely under the discovery rule. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that CleanChoice was charging rates substantially in excess of the rate promised by the variable pricing term in the Terms and Conditions of Service. CleanChoice's monthly bills disclosed only the per-kWh rate charged to Plaintiff—they did not disclose CleanChoice's costs, expenses, or margins. A reasonable residential electricity consumer receiving such bills has no basis to know, and no practical means of determining, that CleanChoice breached the Terms and Conditions of Service. The statute of limitations therefore did not begin to run until Plaintiffs discovered, or reasonably should have discovered, the facts giving rise to these claims.

## CLASS ALLEGATIONS

124.    Plaintiffs bring this action on their own behalf and additionally, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of all New

---

[27] Myles Snyder, *AG:  Ethical Electric Misled Consumers*, ABC27, June 11, 2015, *available at* https://www.abc27.com/news/ag-ethical-electric-misled-consumers/ (last visited April 24, 2026).

[28] *Id.*

Jersey CleanChoice customers who were charged for electricity services by CleanChoice from the earliest allowable date through the date of judgment (the "Class").

125.    As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendants. Defendants have engaged in uniform and standardized conduct toward the Class—its marketing and billing practices—and this case is about the responsibility of Defendants for their knowledge and conduct in deceiving their customers. This conduct did not meaningfully differentiate among individual Class members in their degree of care or candor, their actions or inactions, or their omissions. Upon information and belief, the marketing materials and variable pricing terms in the Terms and Conditions of Service for all of CleanChoice's New Jersey customers (the "Class Members") are materially the same.

126.    Excluded from the Class are Defendants; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendants have or had a controlling interest, or which Defendants otherwise control or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendants.

127.    Plaintiffs reserve the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add additional Subclasses, when Plaintiffs file their motion for class certification.

128.    Plaintiffs do not know the exact size of the Class since such information is in the exclusive control of CleanChoice. Plaintiffs believe, however, that based on the publicly available data concerning CleanChoice's customers in the United States, the Class encompasses at least tens of thousands of individuals whose identities can be readily ascertained from CleanChoice's records. Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

129. The Class is ascertainable because its members can be readily identified using data and information kept by Defendants in the usual course of business and within their control. Plaintiffs anticipate providing appropriate notice to each Class Member in compliance with all applicable federal rules.

130. Plaintiffs are adequate class representatives. Their claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiffs and the other members of the Class were subject to the same or similar conduct engineered by the Defendants. Further, Plaintiffs and members of the Class sustained substantially the same injuries and damages arising out of Defendants' conduct.

131. Plaintiffs will fairly and adequately protect the interests of all Class Members. Plaintiffs have retained competent and experienced class action attorneys to represent their interests and those of the Class.

132. Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

    a. Whether Defendants' misrepresentations and omissions are materially misleading;

    b. Whether CleanChoice breached its contract with Plaintiffs and Class Members by failing to set variable rates in the method dictated by the parties' contract;

    c. Whether Defendants' conduct violates New Jersey consumer protection law;

    d. Whether CleanChoice violated the duty of good faith and fair dealing in its customer contracts;

    e. Whether Class Members have been injured by Defendants' conduct; and

    f. The extent of class-wide injury and the measure of damages for those injuries.

35

133.    A class action is necessary because (i) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; and (ii) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendants' conduct.

134.    A class action is appropriate because Defendants have acted or refused to act on grounds generally applicable to all Class Members.

135.    A class action is superior to all other available methods for resolving this controversy because questions of law and fact common to the Class predominate over any questions affecting only individual Class Members and a class action will fairly and efficiently adjudicate the controversy.

136.    Accordingly, this action satisfies the requirements set forth under Federal Rule of Civil Procedure 23(a) and 23(b).

## CAUSES OF ACTION

### COUNT I
### *Breach Of Contract*
### *(On Behalf Of The Class Against CleanChoice Energy, Inc.)*

137.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

138.    CleanChoice customers have customer agreements whose variable rate terms are substantially similar.

139.    Plaintiffs and the Class entered into valid contracts with CleanChoice for the provision of electricity.

140.    CleanChoice uniformly represents to its New Jersey customers its variable rate for electricity may "vary each month and is based on a number of costs which may include, but are not limited to: energy, transmission, capacity, ancillary services, renewable energy certificates, RTO system fees and other factors, plus CleanChoice Energy operating costs, expenses, and margins."

141.    Upon receiving this pricing term, Plaintiff Snowball signed the Clean Energy Authorization Form which indicated that Plaintiffs "received and understand the terms and nature of my service" and that Plaintiffs "authorize[d] this enrollment."  The enrollment form likewise reiterated that Plaintiffs "received a copy of the terms and conditions of service" and that Plaintiffs "authorize[d] this enrollment."

142.    New Jersey regulations require that a TPS receive "the customer's written signature on a contract or alternative forms of verification identified in N.J.A.C. 14:4-2.3." N.J.A.C. § 14:4-7.6(a). This enrollment authorization is the only document either Plaintiff signed.

143.    Moreover, TPSs cannot submit a change order to begin supplying a customer with electricity unless they have a signed statement indicating that the customer "acknowledges receipt of a copy of the terms and conditions of service." N.J.A.C. § 14:4-2.3(c)(3). Here, Plaintiffs only acknowledged receipt of the Terms and Conditions of Service. Contracts for enrollment with TPSs require a "signature in ink on a paper form." *Id.*

144.    Plaintiff Snowball signed the Clean Energy Authorization Form included with the Terms and Conditions of Service and neither Plaintiff signed any materials included in the Welcome Packet. The Welcome Packet does not contain a place for the customer to sign.

145.    Upon information and belief, Plaintiffs were subject to the same contractual terms for their variable rate for electricity as other customers in New Jersey.

146. Pursuant to the contracts, Plaintiffs and the Class paid the variable rates CleanChoice charged for electricity.

147. However, CleanChoice failed to perform its obligations under its contract to charge rates based on the cost-plus formula identified in the contract. Instead, CleanChoice charged excessive variable rates that were much higher than rates calculated pursuant to the contract's cost-plus variable pricing term.

148. Plaintiffs and the Class were damaged as a result because they were billed, and they paid, a charge for electricity that was higher than it would have been had CleanChoice charged a rate in accordance with the contract.

149. By reason of the foregoing, CleanChoice is liable to Plaintiffs and other Class Members for the damages that they have suffered as a result of CleanChoice's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

150. Additionally, if there is any ambiguity in how any of the terms in the contract are to be applied, every contract contains an implied covenant of a duty of good faith and fair dealing in the performance and enforcement of the contract. This duty applies with particular force here, where CleanChoice's contracts are adhesion contracts containing terms not readily discernible to a layperson—including technical terms such as "transmission, capacity, ancillary services, renewable energy certificates, RTO system fees and other factors,"—and where CleanChoice, as the sole drafter, bore responsibility for the precision of the language it chose.

151. To the extent the contractual terms contain any ambiguity, such ambiguity must be construed against CleanChoice as the sole drafter of this contract of adhesion.

152. Plaintiffs and Class Members also reasonably expected that CleanChoice would not exploit its position as the sole drafter of an adhesion contract to impose charges dramatically in

38

excess of any reasonable construction of the agreed-upon pricing formula. Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy energy from CleanChoice.

## COUNT II
### *Breach Of The Implied Covenant Of Good Faith And Fair Dealing.*
### *(On Behalf Of The Class Against CleanChoice Energy, Inc.)*

153.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

154.    This Count is alleged in the alternative to Count I.

155.    Plaintiffs and the Class contracted with CleanChoice Energy, Inc. for the provision of electricity.

156.    Every contract has an implied covenant of good faith and fair dealing in the performance and enforcement of the contract. The implied covenant is an independent duty and may be breached even if there is no breach of the contract's express terms.

157.    Under the contract, to the extent CleanChoice had discretion to set its variable rates, it was obligated to exercise its discretion in good faith. CleanChoice exercised its discretion in bad faith.

158.    Specifically, for years CleanChoice has been receiving complaints from consumers regarding CleanChoice's high variable electricity rates and that those rates were not consistent with consumers' expectations. Despite these many complaints, CleanChoice acted with a bad motive and continued to gouge consumers.

159.    Likewise, CleanChoice has known for years (i) that its variable electricity rates are consistently higher than the rates the customer's existing utility charges, (ii) that customers paying CleanChoice's variable electricity rates receive no material added benefit in exchange for paying energy rates that are higher than the local utility's rates, other than the minimal cost of RECs,

which cannot account for the egregiously high rates, (iii) that CleanChoice could, but failed to, adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged, and (iv) that CleanChoice could, but failed to, adequately disclose that its costs to purchase RECs are minimal compared to its electricity procurement costs and that REC costs do not justify charging exorbitant rates. Despite this superior knowledge, CleanChoice acted with a bad motive and continued to gouge consumers and small businesses.

160. Further, Defendants' violation of the New Jersey marketing regulations as described herein demonstrates that CleanChoice violated community standards of decency, fairness, and reasonableness.

161. Defendants' failure to comply with the regulations is what permitted CleanChoice to charge Plaintiffs higher rates, and Plaintiffs experienced the adverse consequences in the performance of the parties' agreement.

162. Similarly, CleanChoice's failure to disclose the material information set forth in paragraph 171 below is what permitted CleanChoice to overcharge Plaintiffs and cause them to experience adverse consequences in the performance of the parties' agreement.

163. Plaintiffs reasonably expected that CleanChoice's variable energy rates would not regularly be higher than the utility's rates plus the cost of RECs. Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy electricity from CleanChoice.

164. Plaintiffs also reasonably expected that CleanChoice would refrain from price gouging. Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy electricity from CleanChoice. CleanChoice knew it was engaging in price gouging

40

and nevertheless extracted unreasonable and excessive margins from its variable rate customers. In fact, CleanChoice's margins for its fixed rate products were substantially lower than the margins for its variable rate products—even though CleanChoice incurred greater financial risk from fixed rate products.

165. CleanChoice also had an obligation to set its margin in good faith at a commercially reasonable amount. Instead, CleanChoice charged a margin that was so high, the rate no longer bore any resemblance to a rate actually based on its costs.

166. CleanChoice also presented customers with three separate pricing terms in the contracting materials. To the extent CleanChoice believed one or more of the pricing terms granted it rate-setting discretion, it interpreted the ambiguous and conflicting pricing terms in bad faith and contrary to Plaintiffs' and Class Member's reasonable expectations upon enrolling with CleanChoice. By failing to set rates in accordance with the pricing term provided to Plaintiffs and Class Members in the enrollment materials, CleanChoice deprived Plaintiffs and Class Members of the benefit of the bargain and defied their reasonable expectations.

167. CleanChoice breached the implied covenant of good faith and fair dealing by engaging in the conduct described above.

168. As a result of CleanChoice's breaches, it is liable to Plaintiffs and the Class for damages and attorneys' fees and expenses.

### COUNT III
*Violation Of The New Jersey Consumer Fraud Act.*
*(On Behalf Of The Class Against Defendants)*

169. Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

41

170.    The New Jersey Consumer Fraud Act prohibits, *inter alia*:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise . . .

N.J.S.A. § 56:8-2.

171.    Defendants' material omissions with respect to the rates charged for electricity, as described above, constitute actionable omissions in connection with the marketing, advertising, promotion, and sale of electricity and/or natural gas in violation of the New Jersey Consumer Fraud Act. Specifically, as detailed herein, Defendants made, and continue to make, the following material omissions, including:

a.    Failing to disclose that the variable rate is not based on CleanChoice's cost to acquire supply plus a reasonable markup to cover overhead and margin.

b.    Failing to disclose the true methodology for CleanChoice's variable rate calculation.

c.    Failing to adequately disclose that CleanChoice's variable electricity rates are consistently and significantly higher than the rates the customer's existing utility charges.

d.    Failing to adequately disclose that customers paying CleanChoice's variable electricity rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates, other than the minimal cost of RECs.

e.    Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged.

f.    Failing to disclose that the cost of RECs is minimal in comparison to the cost of electricity supply and cannot justify CleanChoice's egregious price gouging.

172.    The information Defendants concealed would have been material to any consumer deciding whether to purchase electricity from Defendants.

42

173. CleanChoice also engaged in unlawful material misrepresentations, including representing to potential customers that its variable rate will be based on its costs and expenses plus a reasonable margin, when its variable rates are in fact untethered to its costs.

174. Defendants' misrepresentations and false, deceptive, and misleading statements with respect to the rates charged for electricity constitute affirmative misrepresentations in connection with the marketing, advertising, promotion, and sale of electricity and/or natural gas in violation of the New Jersey Consumer Fraud Act. These misrepresentations include:

a. The Notice to New Jersey Residents' claim that customers would "[g]et 100% clean, pollution-free energy."

b. Terms and Conditions of Service's representation that variable rates will be "based on a number of costs which may include, but are not limited to: energy, transmission, capacity, ancillary services, renewable energy certificates, RTO system fees and other factors, plus CleanChoice Energy operating costs, expenses, and margins."

c. The FAQs' claim that "the electricity your home uses will be replenished by clean, renewable wind and solar sources supplied by CleanChoice Energy."

d. The FAQs' claim that "[f]or most consumers, the biggest factor determining the size of their bill is the amount of electricity they use" and that "usage is almost always the biggest factor influencing electricity bills."

e. The FAQs' claim that CleanChoice "offer[s] *only* 100% renewable energy" (emphasis added).

f. The FAQs' claim that "renewable sources do not produce carbon dioxide or contribute to air pollution."

g. The Welcome Letter's claim that "even though we'll be sourcing wind and solar energy on your behalf, nothing else will change in terms of your service."

h. The Welcome Letter's claim that made the false representation that "we'll make sure the energy sourced for you comes from 100% clean wind and solar power."

43

i.    The Welcome Letter's two claims that customers would get "clean, pollution-free energy."

j.    The Welcome Letter's "promise" that CleanChoice would provide "pollution-free, 100% clean energy" and use "only 100% renewable sources" because "[u]nlike most other energy companies, we don't use a mix of blended products with dirty fossil fuels that pollute the environment and contribute to climate change."

175.    Defendants' false, deceptive, and misleading statements would have been material to any potential consumer's decision to purchase electricity from Defendants.

176.    The misrepresentations and omissions are attributable to Defendant Matzzie as the only signatory to the Welcome Packet. No other CleanChoice personnel are listed on any of the materials contained in the Welcome Packet.

177.    TPSs have an obligation to disclose their pricing term conspicuously. N.J.S.A. § 58:3-85(1)(a); *see also* N.J.A.C. § 14:4-7.6(b). To the extent CleanChoice tries to rely on pricing terms contained in the Welcome Packet, the interaction between the three pricing terms provided was not clearly and conspicuously disclosed, and CleanChoice took advantage of this violation by charging a variable rate that was not calculated in accordance with the cost-plus formula in the Terms and Conditions of Service.

178.    Moreover, a TPS's pricing term is required to be disclosed in at least 12-point font. None of CleanChoice's pricing terms satisfy this requirement. Plaintiffs' counsel checked this in two ways. First, Plaintiffs' counsel used the edit function in Adobe Acrobat, which allows users to see the font size for a given text. That tool indicates that the font of the pricing term in the Terms and Conditions of Service was 9-point, the pricing term in the Disclosure Statement was 8-point, and the pricing term in the Contract Summary was 10-point. Plaintiffs' counsel then converted the documents from a PDF to a Microsoft Word document to use Microsoft Word's font size tool. Microsoft Word's font size tool likewise indicated that the pricing term on the Terms and

44

Conditions of Service was 9-point, the pricing term in the Disclosure Statement was 8-point, and the pricing term in the Contract Summary was 10-point.

179.    The purpose of the font size requirement is to make sure customers know the exact terms to which they are agreeing. CleanChoice violated this provision to obscure the material terms of the agreement.

180.    TPSs are also required to provide "a clear and unambiguous statement of the precise mechanism or formula by which the price will be determined." N.J.A.C. § 14:4-7.6(b)(2). To the extent CleanChoice claims that the pricing term in the Terms and Conditions of Service is not a "precise mechanism or formula by which the price will be determined" that uses CleanChoice's supply costs plus a reasonable fixed adder to cover CleanChoice's "operating costs, expenses, and margins," CleanChoice violated this provision and took advantage of any ambiguity to price gouge its customers.

181.    Plaintiffs relied on CleanChoice's representations in deciding to enroll with CleanChoice. CleanChoice's representations were material to Plaintiffs' decision making.

182.    Defendants' misrepresentations and omissions were outside the norm of reasonable business practices, unconscionable, and constitute substantial aggravating circumstances under the New Jersey Consumer Fraud Act. Had CleanChoice not committed the misrepresentations and omissions detailed herein, Plaintiffs and Class Members would not have agreed to accept CleanChoice's electricity supply.

183.    Defendants made these false, deceptive, and misleading statements and omissions with the intent that their customers rely upon such statements.

45

184.    Plaintiffs and the other Class Members entered into agreements to purchase electricity from Defendants and suffered ascertainable loss as a direct and proximate result of Defendants' actions in violation of the New Jersey Consumer Fraud Act.

185.    As a consequence of Defendants' wrongful actions, Plaintiffs and the other members of the Class suffered an ascertainable monetary loss, including but not limited to the difference between the price Plaintiffs and Class Members paid and the price they would have paid had Defendants set the variable rate based on the formula set forth in the Terms and Conditions of Service.

186.    Plaintiffs and Class Members suffered an ascertainable loss caused by Defendants' misrepresentations and omissions because they would not have entered into an agreement to purchase electricity from CleanChoice if the true facts concerning its rates had been known.

187.    By reason of the foregoing, Defendants are liable to Plaintiffs and Class Members for trebled compensatory damages; punitive damages; attorneys' fees, and the costs of this suit. N.J.S.A. §§ 56:8-2.11, 8-2.12, 8-19.

188.    Defendants know full well that CleanChoice charges variable rates that are unconscionably high, and the misrepresentations and omissions they make regarding CleanChoice's rates were made to induce customers to purchase electricity from CleanChoice. Defendants made these misrepresentations and omissions without regard to the consequences high utility bills cause New Jersey consumers. Defendants' conduct was intentional, wanton, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to the well-being of Plaintiffs and the other members of the Class. Defendants are therefore additionally liable for punitive damages, in an amount to be determined at trial.

## COUNT IV
### *Violation Of The EDECA And Retail Choice Consumer Protection Regulations*
### *(On Behalf Of The Class Against Defendants)*

189.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

190.    Under N.J. Admin. Code § 14:4-7.3(d)(1) electric power suppliers like Defendants are prohibited from making false or misleading advertising claims to a potential residential customer.

191.    Under N.J. Admin. Code § 14:4-7.4(n)(1) electric power suppliers like Defendants are prohibited from making false or misleading marketing claims to a potential residential customer.

192.    N.J. Admin. Code § 14:4-7.13 provides a private right of action to residential customers who were subjected to false or misleading advertising or marketing by an electric power supplier in violation of either N.J. Admin. Code § 14:4-7.3(d)(1) or N.J. Admin. Code § 14:4-7.4(n)(1).

193.    Defendants' material misrepresentations and omissions with respect to the rates charged for electricity and the "100% clean, pollution-free" nature of the electricity, as described above, constitute false and misleading advertising and marketing under N.J. Admin. Code § 14:4-7.3(d)(1) or N.J. Admin. Code § 14:4-7.4(n)(1).

194.    The misrepresentations and omissions are attributable to both CleanChoice and Defendant Matzzie.

195.    Plaintiffs and all Class Members were subjected to Defendants' false and misleading advertising and marketing under N.J. Admin. Code § 14:4-7.3(d)(1) or N.J. Admin. Code § 14:4-7.4(n)(1).

47

196. Defendants collected charges for electric supply service from Plaintiffs and all Class Members.

197. Defendants presented their contracts and marketing materials in less than 12-point font in violation of N.J.S.A. § 48:3-85(a)(1) and in doing so obscured material terms.

198. By reason of the foregoing, Defendants are liable to Plaintiffs and Class Members for an amount equal to all charges paid by these customers to CleanChoice after such violations occurred.

199. By reason of the foregoing, Defendants are also liable to Plaintiffs and Class Members for a civil penalty pursuant to N.J.S.A. § 48:3-83, which provides for civil penalties for violations of EDECA. *See also*  N.J.A.C. § 14:4-7.13 (violations of the above regulations subject TPS to civil penalties of N.J.S.A. § 48:3-83).

200. Plaintiffs and Class Members further seek equitable relief against Defendants. This Court has the power to award such relief, including but not limited to, an order declaring Defendants' practices to be unlawful, an order enjoining Defendants from engaging in any further unlawful conduct, and an order directing Defendants to return to the Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

201. As a result of Defendants' false and misleading advertising and marketing, Plaintiffs and Class Members are also entitled to their damages, costs, and reasonable attorneys' fees and all other relief available.

**COUNT V**
***Violation Of The Truth-In-Consumer Contract, Warranty, And Notice Act ("TCCWNA")***
***(On Behalf Of The Class Against Defendants)***

202. Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

48

203.   The TCCWNA states:

No seller, lessor, creditor, lender or bailee shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty, notice or sign after the effective date of this act which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed.

N.J.S.A. § 56:12-15.

204.   Plaintiffs and Class Members are "consumers" within the meaning of N.J.S.A. § 56:12-15.

205.   Defendants are a "seller" within the meaning of N.J.S.A. § 56:12-15.

206.   Defendants violated the TCCWNA by inducing Plaintiffs and Class Members to switch their energy supplier to Defendants using contract terms that violate the Consumer Fraud Act and EDECA by making misrepresentations and false, deceptive, and misleading statements and material omissions with respect to the rates charged for electricity, the nature of the electricity supplied, and in violation of the font and disclosure requirements, as described above, in connection with the marketing, advertising, promotion, and sale of electricity. N.J.S.A. § 56:8-2.

207.   The misrepresentations and omissions are attributable to Defendant Matzzie as the only signatory to the Welcome Packet. No other natural persons are listed on any of the materials contained in the Welcome Packet (other than Plaintiff Snowball).

208.   Defendants violated Plaintiffs' and Class Members' legal rights under the CFA and EDECA and therefore, Defendants violated the TCCWNA.

209.   As a result of Defendants' violations of the TCCWNA, Plaintiffs and Class Members are entitled to statutory damages of not less than $100 for each of Defendants' TCCWNA violations. N.J.S.A. § 56:12-17.

49

210. Defendants' violations of the Consumer Fraud Act and EDECA, and thus the TCCWNA, continue to cause Plaintiffs harm. Every time Defendants charged a variable rate under the false guise and auspices of a violative marketing, violations about which Plaintiffs were unaware, they were injured anew.

## COUNT VI
### *Unjust Enrichment*
### *(On Behalf Of The Class Against Defendants)*

211. Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

212. This cause of action is pleaded in the alternative to Plaintiffs' contract claim. To the extent the Court determines that a valid contract exists between all parties, Plaintiffs do not intend to proceed with their unjust enrichment claim.

213. In addition, Defendant Matzzie was unjustly enriched from the conduct alleged herein.

214. Plaintiffs and the Class Members conferred a tangible economic benefit upon CleanChoice by contracting with CleanChoice for electricity. Plaintiffs and the Class would not have contracted with CleanChoice for electricity had they known that CleanChoice would abuse its informational advantage and charge commercially unreasonable rates.

215. Plaintiffs and the Class Members would not have purchased energy from CleanChoice had they known the truth about CleanChoice's electricity rates.

216. By engaging in the conduct described above, CleanChoice has unjustly enriched itself and received a benefit beyond what was contemplated by the parties at the expense of Plaintiffs and Class Members.

217. It would be unjust and inequitable for CleanChoice to retain the payments Plaintiffs and Class Members made for excessive energy prices and charges.

218.   Therefore, CleanChoice is liable to Plaintiffs and Class Members for the damages that they have suffered as a result of CleanChoice's actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a)   Issue an order certifying the Class defined above, appointing the Plaintiffs as Class Representatives, and designating the undersigned law firms as Class Counsel;

b)   Find and declare that CleanChoice breached its contracts with the Class;

c)   Find and declare that CleanChoice violated New Jersey consumer protection law;

d)   Render an award of compensatory damages, the precise amount of which is to be determined at trial;

e)   Issue an injunction or other appropriate equitable relief requiring Defendants to refrain from engaging in the deceptive practices alleged herein;

f)   Render an award of punitive damages or other statutory, treble, exemplary or other damages or fines;

g)   Enter judgment including interest, costs, reasonable attorneys' fees, and expenses; and

h)   Grant all such other relief as the Court deems appropriate.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiffs demand that a jury determine any issue triable of right.

## NOTICE TO ATTORNEY GENERAL

A copy of this Complaint will be electronically mailed to the Attorney General of the State of New Jersey within twenty-four hours of its filing, pursuant to N.J.S.A. § 56:8-20.

Dated: April 24, 2026

Respectfully submitted,

**FINKELSTEIN & PARTNERS, LLP**

*/s/ Kenneth Fromson*
Kenneth Fromson (ID No. 056201994)
1270 Route 300
Newburgh, New York 12551
Tel: (845) 563-9459
kfromson@lawampm.com

**WITTELS MCINTURFF PALIKOVIC**

Daniel J. Brenner*
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Tel: (914) 775-8862
djb@wittelslaw.com

*\* Pro hac vice application forthcoming*

*Counsel for Plaintiffs and the Proposed Class*